**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-01464

KYLE ACIERNO

      Plaintiff,

v.

ISPACE TECHNOLOGIES U.S. INC., a foreign corporation,

      Defendant.

---

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

---

### I.      INTRODUCTION

After dedicating himself to ispace[1] for seven years, Kyle Acierno was abruptly terminated from the company without legitimate justification. Instead, Mr. Acierno was fired because of his race (White) and national origin (American). This was a predictable outcome, given ispace's pervasive "anti-foreigner" culture during the seven years of dedication Mr. Acierno gave to the company. He was repeatedly subjected to discrimination, hostility, and distrust by Japanese employees at the company, including its founder and Chief Executive Officer, Takeshi Hakamada. Mr. Acierno was ultimately fired after CEO Hakamada felt he had become "too influential" as a foreigner and

---

[1] The company name "ispace" is trademarked in all lowercase letters.

justified the termination by telling Mr. Acierno that the Japanese are "afraid of Americans." Plaintiff brings this action to challenge a pattern of race and national origin discrimination and retaliation committed by ispace Technologies U.S. Inc. ("ispace US"), a wholly owned subsidiary of a Japanese company, ispace inc., in Tokyo, Japan. Such violations by ispace US and Japan are systemic in nature and constitute a pattern of conduct which for many years has, and continues to, permeate the Company - resulting in a denial of equal terms and conditions of employment towards non-Japanese employees.

## JURISDICTION, VENUE, AND PARTIES

1.      This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* as amended by Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981(a).

2.      Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391(b).  Ispace's principal place of business in the United States is located in Colorado and a substantial part of the events of omissions giving rise to this claim, including the unlawful employment practices alleged herein, occurred in this district.

3.      At all relevant times material to this Complaint, Mr. Acierno was employed by ispace Japan and subsequently ispace US. Mr. Acierno is a Caucasian male, born in Canada and is of North American ancestry.

4.      Defendant ispace US is, and at all relevant time hereto was, a wholly owned subsidiary of ispace Japan, a Japanese Corporation. Ispace US is a Colorado corporation with a principal place of business at 12876 E. Adam Aircraft Circle, Englewood, CO 80112. During the relevant time period, ispace US met the definition of "employer" under all relevant statutes.

5.      Ispace US is a government contractor, which is subject to the provisions of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and Executive Order 11246, as amended. As such, ispace US must comply with the federal, state, and local laws prohibiting employers from discriminating against employees in hiring, promotion, compensation, discharge, and other terms and conditions of employment, based on factors including but not limited to, the employee's race and national origin.

**ADMINISTRATIVE EXHAUSTION**

6.      Mr. Acierno filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 28, 2022.

7.      The Charges of Discrimination include allegations of race, national origin, and retaliation.

8.      The EEOC issued Mr. Acierno a Notice of Right to Sue on March 14, 2023.

9.      Plaintiff has filed this action within 90 days of the date the EEOC issued the Notice of Right to Sue.

**FACTUAL ALLEGATIONS**

**Kyle Acierno's Educational and Work History**

10.     Kyle Acierno was born and raised in a small town in the Canadian Rocky Mountains. Mr. Acierno is part of a protected class, including racially (White) and by means of ethnic or national origin (American).

11.     Mr. Acierno spent four years at Simon Fraser University in Burnaby, Canada. There, he focused his education and research on local environmental projects while developing a global model for environmental change. After graduating, Mr. Acierno applied for and won a scholarship to the International Space University ("ISU") in Strasbourg, France, where he graduated valedictorian of his class.

12.     Mr. Acierno completed his master's degree at ISU, focusing his research on the economic and legal aspects of lunar resources utilization.

13.     During his studies, Mr. Acierno was introduced to Takeshi Hakamada, the Chief Executive Officer of a small start-up in Tokyo, Japan called ispace.

14.     In June of 2015, CEO Hakamada offered Mr. Acierno a three-month internship at the company.

15.     Ispace was operating with only four staff members and limited financial means at that time, and therefore Mr. Acierno covered his own airfare and accommodation during the internship.

16.     In the three months of his internship, Mr. Acierno worked tirelessly to develop a model for ispace to expand into a global company with more significant revenue

streams and opportunities for growth. He prepared business plans and strategies for extending ispace's work beyond Japan, focusing on American and European markets.

17.     As a result of Mr. Acierno's passion and hard work, CEO Hakamada hired Mr. Acierno at the end of his three-month internship and brought him on as a Global Business Development Manager for ispace, with the stated objective of developing a pipeline to market ispace's services to global commercial companies and governments.

18.     In the following years, Mr. Acierno established a global presence for the company, scoring speaking opportunities across the world, and developing an important connection with the United States National Aeronautics Space Administration's ("NASA") Ames research Center ("NASA AMES"), located at Moffett Federal Airfield in California's Silicon Valley.

19.     As a result of Mr. Acierno's relationship with NASA AMES, ispace designated a small office in California that was used to partner with researchers developing lunar rovers.

20.     Mr. Acierno obtained letters of intent and memoranda of understanding from dozens of companies, all of which resulted in ispace's ability to raise nearly $100M in investments.

21.     Mr. Acierno traveled extensively on behalf of ispace, developing lucrative business connections in many countries.

22.     For example, in 2017, after Luxembourg announced it would set aside $200 million to invest in companies exploring space resource extraction. Mr. Acierno flew to the

country of Luxembourg to meet with government officials and convinced them to visit ispace in Japan.

23.     After numerous months of discussion, Mr. Acierno successfully negotiated a double digit million Euro deal between Luxembourg and ispace, resulting in ispace opening an office in Luxembourg and making Mr. Acierno the office's Managing Director.

24.     In his two years as Managing Director, Mr. Acierno grew the Luxembourg office from zero to twenty-five employees and spearheaded the Lunar Rover Project.

25.     After his success in Luxembourg, ispace promoted Mr. Acierno and asked him to come back to the Tokyo headquarters in 2019, promising him the title of Vice President of Global Sales and Strategy.

26.     In this role, Mr. Acierno prospected and captured nearly $10 million in payload sales[2] from customers in the United Arab Emirates, Canada, and the United States.

27.     He also developed the strategy for ispace to bid on a NASA contract and became the point of contact between third-party partners, ispace, and NASA.

28.     In August 2020, ispace opened its first U.S. office in Denver, Colorado. The American subsidiary is called Ispace Technologies U.S., Inc. ("ispace US").

29.     Hakamada appointed Mr. Acierno as the Chief Executive Officer (CEO) of the American subsidiary.

30.     As CEO of ispace US, Mr. Acierno grew the company from its early days

---

[2] Commercial space payload refers to the revenue-producing satellites or cargo sent to the Earth's orbit using a space launch vehicle.

of a few employees into a company that employed forty-five individuals.

31.     Ispace US is highly regarded within the field of lunar exploration and Mr. Acierno's efforts in overseeing the development, expansion, and technical expertise of the ispace US team has been critical in the larger company's recent achievements.

32.     In July 2022, as a result of Mr. Acierno and his team's enduring efforts, ispace US, in partnership with Draper Laboratory, was awarded a $73 million contract with NASA to deliver payloads to the Moon, by far the biggest contract ispace has ever been awarded.

### Mr. Acierno is a World-Renowned Expert in the Space Exploration Industry

33.     Throughout his career with ispace Japan and ispace U.S., Mr. Acierno has published unique, scholarly articles in major trade publications, further burnishing ispace's image and reputation. For example, the International Aeronautical Federation, the most renowned trade group in the global space sector, published research Mr. Acierno authored, titled "*Moving Forward After the Google Lunar Xprize, ispace's Plan for The Commercial Exploration and Exploitation of The Moon.*"

34.     Mr. Acierno has also served as a member of several lunar exploration associations, all of which required distinguished achievements for selection. For example, he was selected as one of the thirty-five members to serve on the Hague Space Resources Working Group, which was established in 2016 with the purpose of developing a governance framework on space resources. Mr. Acierno was further nominated to be Chair of the Industrial Committee, leading the effort in providing policy suggestions from the perspective of industry. These suggestions were ultimately presented to the United

Nations Committee on the Peaceful Uses of Outer Space.

35.     In addition, Mr. Acierno has served in a critical role as one of eleven board members for World Space Week. World Space Week has been recognized by the United Nations as "the largest annual space event in the world." Every year the World Space Week Association Board of Directors selects a theme to highlight an aspect of space with broad appeal to humanity and then assists in the organization of events around the world. As a board member, Mr. Acierno's contributions have been critical to the success of World Space Week.

36.     Over the last several years, his work has been picked up by major media and publication sources, including CNBC, the Japan Times, Delano, the Denver Post, Space News, and the Financial Times.

37.     As a well-respected expert in the field with a long track record of dedication, success, and technical know-how, Mr. Acierno has won international acclaim for his work and achievements.

### Discrimination Against Non-Japanese Employees is Common at ispace

38.     Ispace identifies itself as a commercial company with a global team working together to do what has been done before – land on the moon. This messaging has allowed the company to draw talent from around the world over the last ten years.

39.     However, as the number of foreign employees increased at ispace Japan, so did the hostility towards them.

40.     Mr. Acierno sensed racial and ethnic preferences begin to permeate ispace, particularly in the form of exclusionary attitudes or opinions of Japanese management

and executives towards non-Japanese employees.

41.     The earliest and a blatant example of discrimination can be found during one of the early ispace projects called the Lunar Lander Project.

42.     The team and the team leaders for the project comprised almost entirely of non-Japanese employees with 75% of the engineering team on the project being non-Japanese.

43.     Japanese engineers refused to take orders from non-Japanese team leads. Such insubordinate behavior disrupted the normal workload and introduced delays in the project.

44.     A non-Japanese team lead, Mohammed Ragab, was in charge of the entire Lunar Lander project. He had over 30 years of experience working in some of the largest space companies in the United States.  As just one example of many, Japanese members of the software team on the project, led by Japanese employees Yuuya Sugaita and Fumiaki Yamana, refused to attend most meetings, including critical reviews, and report any progress for the course of the year to Mr. Ragab. These members, as well as Electric Manager, Ryo Ujiie, constantly undermined Mr. Ragab. This was tolerated by CEO Hakamada.

45.     Eventually, Mr. Ragab was removed from his position by CEO Hakamada, and assigned to a lower position with little to no management responsibilities. Ultimately, Mr. Ragab's position was filled by a Japanese team lead.

46.     Mr. Acierno became increasingly concerned that non-Japanese engineers and managers were being replaced by Japanese engineers or business members at an

alarming rate and for reasons that had nothing to do with their competence or expertise.

47.     Over time it appeared that Japanese ispace employees were engaging in an organized attempt to undermine non-Japanese managers to get them removed or demoted from their position.

48.     Such behavior was confirmed when a Slack conversation was leaked showing upper-level Japanese employees, including electric manager Ryo Ujiie, using racist, derogatory, and discriminatory terms to refer to non-Japanese employees and discussing ways to have them terminated from the company.

**Blatant Acts of Discrimination Against Non-Japanese Employees are Ignored**

49.     The animosity between Japanese and non-Japanese employees reached a critical point in April of 2019, when more than twenty ispace employees anonymously received a Slack conversation between five upper level Japanese ispace employees: Daisuke Furutomo, Head of Procurement and a personal friend of CEO Hakamada, Kenya Ueno, Senior Design Engineer, Yuuya Sugita and Fumiaki Yamana, both Seniors on the Software Development Team, and Ryo Ujiie, who at the time was an electrical manager, but after Mr. Ragab's removal became the leader of the Lunar Lander project and was ultimately promoted to the Chief Technology Officer (CTO).

50.     The conversation included numerous racist and discriminatory comments directed towards non-Japanese ispace employees.

51.     The leaked conversation confirmed what Mr. Acierno and other non-Japanese employees already knew to be true; there was rampant discrimination in ispace and the chat participants were engaged in a concerted effort to undermine non-Japanese

managers/leads by fabricating false accusations of incompetence against them.

52.  Throughout the conversation that took place over numerous months, the five Japanese employees discuss their dislike of non-Japanese employees and how they intended to remove them from their positions at ispace. Below are a few excerpts from the 130-page conversation.

- They talk about replacing non-Japanese leads at ispace:

  - *Daisuke: I'll replace Ana. Let's have a strategy meeting over dinner somewhere next week…*
  - *Ujiie:I know Ana will be pissed if I come out, but maybe I should directly inform Jamie and Ana of my intentions....*
  - *Daisuke: Jamie and Ana are not doing well. It's cancer.*
  - *Ujiie: I guess we'll just have to let them go down in flames once and for all....*

- Ryo Ujiie had a particular dislike for non-Japanese employees in leadership positions. He often attacked Jaime Denniston, who was the head of the lander Team L:

  - Ujiie: *Jamie, this is too much. I really want you to cut it off.*
  - k-ueno: *Let's cut it off*
  - Ujiie: *I haven't seen such a big son of a bitch since Daniele.*

- Ryo Ujiie and the others make a plan to speak to CEO Hakamada about removing non-Japanese employees from ispace:

  - Yamana: *Who's the target for tomorrow?*
  - Ryo Ujiie: *Well, Ana's likely to be gone soon, so let's leave her alone…*
  - Ujiie: *Jakub is a bit mazy. I had a meeting today, but first of all, the general way of working is not good.*
  - Ujiie: *Seriously, he is scum.*
  - Ujiie: *I know an engineer (propulsion fluid simulation guy) who can replace Sergio and is interested in ispace lol*
  - k-ueno: *You should fire this guy right now.*

- Later they talk about Mr. Acierno himself and how they hope he fails:

○ Yamana: *I think Kyle's a bit of a "it's just a venture, it's normal to fail" kind of guy.*
○ Ujiie: *I hope it's a courageous failure.*

53.     Towards the end of the conversation, Ryo Ujiie states that they should approach the Japanese Foreign Ministry to stop issuing visa to foreigners, to which someone responds that it will likely happen soon and to "hang in there."

54.     Individuals discussed in the Slack conversation (Ana, Jaime, Sergio, Mohammed, Jakub, and Kyle) were eventually either forced out of their jobs or actually fired.

55.     After the messages leaked, the company's human resources department focused on finding the source of the leak, going as far as to hire an outside company to search for the culprit.

56.     Instead of addressing the overt hostility against its non-Japanese employees festering in the company, human resources requested all employees who had received the Slack message to delete the email.

57.     A few days later ispace held a meeting between the non-Japanese employees discussed in the messages along with CEO Hakamada and Chief Financial Officer ("CFO") Jumpei Nozaki.

58.     CFO Nozaki spent most of the time discussing the consequences for leaking confidential information, rather than addressing its impropriety or making amends.

59.     In fact, Mr. Nozaki excused the contents of the chat as "normal behavior" and stated that it would be "too much" to ask the chat participants to apologize.

60.     Despite the disturbing nature of the communications, none of the

employees involved in the conversation were reprimanded for their behavior, in fact Ryo Ujiie was promoted to Manager and ultimately to Chief Technology Officer by CEO Hakamada.

61.     In recorded conversations, CEO Hakamada admits to Mr. Acierno that he was being terminated from his position with the advice of upper level management, which include Ryo Ujiie.

### Kyle Acierno Complains to Human Resources About the Discrimination He Witnessed at ispace

62.     In March of 2019, a month before the Slack conversation was leaked, Mr. Acierno had just returned back to Tokyo from Luxembourg.

63.     Upon his return to Tokyo, ispace refused to let Mr. Acierno use his title of Vice President internally, and instead insisted he go by the title of Manager.

64.     CEO Hakamada explained to Mr. Acierno that Japanese managers would be upset if a non-Japanese employee was considered higher in the pecking order of the organization and superior to them.

65.     Other managers, such as Yoshi Ikeda and Masashi Sato, Head of Industry Creation, had already raised concerns about Mr. Acierno ranking above them.

66.     When the Slack conversation came to light, Mr. Acierno pushed for upper management to enact reforms at the company.

67.     However, ispace not only refused to enact any measures to address the discriminatory animus pervading the company, but they failed to hold any of the responsible actors accountable.

68.     Due to ispace's continued tolerance and acceptance of the animus levied

against non-Japanese employees, Mr. Acierno submitted a letter of resignation to CEO Hakamada on June 30, 2020.

69.     During a face-to-face meeting with Human Resources Director, Mie Mastumoto, Mr. Acierno cited the above examples of discrimination he witnessed and faced while at ispace.

70.     He also notified Ms. Mastumoto that despite being Vice President and responsible for building the relationship between ispace and Draper Laboratory,[3] ispace had chosen to replace Mr. Acierno with Mr. Ikeda. Mr. Ikeda had no space experience, no experience with NASA, and no interaction with the Draper team. Mr. Ikeda was chosen by CEO Hakamada only because he was Japanese and could be 'trusted'.

71.     After receiving Mr. Acierno's resignation letter, CEO Hakamada scheduled urgent meetings with Mr. Acierno, urging him not to leave ispace, stating numerous times in these meetings that he 'still' needed him.

72.     CEO Hakamada spent a lot of time persuading Mr. Acierno that his complaints of discrimination would be addressed and promised that the company would make necessary changes.

73.     CEO Hakamada confided in Mr. Acierno that ispace was planning to open a U.S. office and promised to name him CEO of ispace Technologies U.S. Inc.

---

[3] Draper Laboratory is a non-profit research and development organization, headquartered in Cambridge, Massachusetts. Draper, in partnership with ispace, was named a Commercial Lunar Payload Services contractor by NASA in 2018, making it eligible to bid on delivering science and technology payloads to the Moon for NASA. In 2019, Draper proposed a lunar lander called Artemis-7. The lander would be designed and built by ispace.

74.     With promises of change in place, Mr. Acierno withdrew his resignation and remained at ispace.

**Kyle Acierno Successfully Establishes First ispace Office in the United States but Is Summarily Fired**

75.     In August of 2020, Mr. Acierno moved to Denver, Colorado to begin his role as CEO of ispace Technologies U.S., Inc.

76.     He worked tirelessly for two years during the COVID-19 pandemic, hiring and growing the U.S. office to over 40 employees.

77.     In the summer of 2022, his hard work paid off and NASA awarded Team Draper, including ispace Technologies U.S., Inc., a $73 million Commercial Lunar Payload Services ("CLPS") contract.

78.     To obtain such a contract, ispace US must comply with Executive Order 11246, precluding discrimination in hiring, promotion, compensation, discharge, and other terms and conditions of employment.

79.     Despite assurances that discrimination in the company would be addressed, when Mr. Acierno won the NASA CLPS contract, CEO Hakamada refused to allow Mr. Acierno and Patrick Shea, Capture/Program Lead at ispace U.S., and another US-based employee responsible for winning the NASA contract, to have any involvement in contract negotiations.

80.     According to CEO Hakamada, he did not trust a non-Japanese to negotiate on behalf of ispace and instead designated Hiro Furihata, Head of Industry Creation, in charge of negotiations, sidelining Mr. Acierno and Mr. Shea throughout the process.

81.     Mr. Furihata had no contractual experience with the US government, but as he was Japanese, he was considered more trustworthy.

82.     Mr. Acierno complained to CEO Hakamada about such actions, observing that they constituted further racism towards non-Japanese employees.

83.     CEO Hakamada simply reiterated that he preferred to have Japanese people manage such processes, and his preferences were not going to change.

84.     Within two weeks of complaining about the discrimination, CEO Hakamada personally terminated Mr. Acierno.

85.     CEO Hakamada explained that he was terminating Mr. Acierno because ispace leadership feared that if they retained Mr. Acierno, he would "take strong leadership" after winning such a big contract. Meaning he was afraid Mr. Acierno could be perceived to be more powerful than Japanese employees at ispace.

86.     In further conversations with Mr. Acierno after the termination, CEO Hakamada explained to Mr. Acierno that Japanese people have a distrust and are "afraid of Americans," and that he could no longer allow Mr. Acierno to manage the company.

87.     CEO Hakamada also explained that in making his decision he consulted with the CXOs (CTO Ryo Ujiie, CFO Jumpei Nozaki, and CRO Atsushi Saiki) before terminating Mr. Acierno.

88.     Later in the conversation, he explained that he had not found a replacement, and instead named himself CEO of ispace U.S. in the interim.

89.     In conversations with Mr. Shea about Mr. Acierno's termination, CEO

Hakamada told him that he wanted someone he could trust and preferred a Japanese American to lead ispace U.S.

90.    Hakamada stated in his conversation with Mr. Acierno, "Many of the people don't match this job. We need to be very selective. I don't think the pool is big." Mr. Acierno understood this to mean that CEO Hakamada intended to replace Mr. Acierno with someone who was Japanese.

91.    Mr. Acierno asked CEO Hakamada for access to exercise his stock options, of which 75% had vested over the length of time he had been at ispace. CEO Hakamada denied his request and verbally threatened him by saying that if Mr. Acierno tried to exercise his stock, "[He] will have [a] lot of enemies!"

**Kyle Acierno was Integral to Growing ispace and was a Beloved Leader at the Company**

92.    Mr. Acierno helped ispace grow from a four-person company to a multi-million-dollar international competitor in the field of space exploration.

93.    Ispace was home for Mr. Acierno, and for seven years he devoted all his time and energy to the company.

94.    Mr. Acierno had every intent of remaining at the company for the remainder of his career, had he not been terminated for discriminatory reasons.

95.    Mr. Acierno was beloved by his team and his termination came as a shock to all of them.

96.    Throughout his extraordinary tenure at ispace, Mr. Acierno added significant value to the company. Revenue growth accelerated under his watch, and he brought in millions of dollars' worth of contracts, paving the way for the now successful

IPO.

97.     Mr. Acierno lived in Japan for a total of three years and, at the request of the company, spent two years each in both Luxembourg and the United States. He opened those offices alone and grew them to multiple dozens of employees with full operational capacity, all the while establishing close relationships with space agencies and customers.

98.     Mr. Acierno's performance at ispace was one of the strongest of any manager, and only a few weeks prior to his termination he had helped ispace win its largest contract in history.

99.     Mr. Acierno was terminated, according to CEO Hakamada, because he was too strong of a leader and could not be trusted because he was "American" rather than "Japanese."

100.    Thus, on its face, racial and national origin bias and animus are the only reasons for Mr. Acierno's termination from ispace.

**STATEMENT OF CLAIMS FOR RELIEF**
**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1981 et seq.**
**Discrimination**

101.    Plaintiff hereby incorporates all other paragraphs of this complaint as if fully set forth herein.

102.    Plaintiff is Caucasian of Canadian and North American ancestry.[4]

---

[4] The Supreme Court has held that § 1981 prohibits racial discrimination in private employment against white persons as well as nonwhite persons. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976) ("Th[e] cumulative evidence of congressional intent makes clear, we think,

103.     Defendant ispace discriminated against Plaintiff by terminating him because of his race (White, Non-Japanese) in violation of Section 1981.

104.     But for Plaintiff's race and ethnicity, he would not have been subjected to the unlawful employment practices complained of above.

105.     The effect of the practices complained of in the forgoing paragraphs has been to deprive Plaintiff of the enjoyment of the benefits of employment and has otherwise adversely affected his status as an employee in violation of U.S.C. § 1981.

106.     The unlawful practices described above were intentional.

107.     The unlawful employment practices complained of above were done with malice or with reckless indifference to Plaintiff's federally protected rights.

108.     As a direct result of Defendant's actions, Plaintiff has suffered significant injuries, damages, and losses to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1981**
**Retaliation**

109.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

110.     Plaintiff opposed race-based discrimination by ispace that he reasonably believed was unlawful under 42 U.S.C. § 1981.

---

that the 1866 statute, designed to protect the 'same right ... to make and enforce contracts' of 'citizens of every race and color' was not understood or intended to be reduced ... to the protection solely of nonwhites.").

111.   Plaintiff reported the racial discrimination to Defendant and its managers, supervisors, and other employees.

112.   Defendant intentionally and unlawfully retaliated against Plaintiff for opposing the discrimination by terminating his employment.

113.   But for Plaintiff's protected complaints of race-based discrimination, he would not have been subjected to the unlawful employment practices complained of above.

114.   The effect of the practices complained of in the forgoing paragraphs has been to deprive Plaintiff of the enjoyment of the benefits of employment and has otherwise adversely affected his status as an employee in violation of 42 U.S.C. § 1981.

115.   The unlawful practices described above were intentional.

116.   The unlawful employment practices complained of above were done with malice or with reckless indifference to Plaintiff's federally protected rights.

117.   As a direct result Defendant's actions, Plaintiff has suffered significant injuries, damages, and losses to be determined at trial.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 2000e**
**Discrimination**

118.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

119.   Defendant's discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's race (White) and

national origin (Canadian or North American).[5]

120.    Defendant's animus towards Plaintiff's race and national origin is revealed in instances where similarly situated Japanese employees were treated differently than Plaintiff in respect to their terms, conditions, and privileges of employment, and in his termination, which was because of his race and national origin.

121.    Defendant has undertaken these discriminatory practices willfully or with reckless disregard for the Plaintiff's rights protected under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2.

122.    These employment practices violate Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2.

123.    The aforementioned acts of Defendant constitute unlawful discrimination against Plaintiff in the terms, conditions and privileges of his employment because of his race and national origin and in retaliation against him in violation of the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2.

124.    As a direct result Defendant's actions, Plaintiff has suffered significant injuries, damages, and losses to be determined at trial.

---

[5] Title VII of the Civil Rights Act of 1964 prohibits the discharge of "any individual" because of "such individual's race," 42 U.S.C. s 2000e-2(a)(1). Title VII has been interpreted to proscribe racial discrimination in private employment against whites on the same terms as racial discrimination against nonwhites, holding that to proceed otherwise would "constitute a derogation of the Commission's Congressional mandate to eliminate all practices which operate to disadvantage the employment opportunities of any group protected by Title VII, including Caucasians." *McDonald v. Santa Fe Trail Transp. Co*., 427 U.S. 273, 295, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) quoting *EEOC Decision No. 74-31*, 7 FEP 1326, 1328, CCH EEOC Decisions ¶ 6404, p. 4084 (1973).

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 12203 et seq.**
**Retaliation**

125.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

126.    Plaintiff opposed race and national origin-based discrimination by ispace that he reasonably believed was unlawful under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2.

127.    Plaintiff reported the racial and national origin discrimination to Defendant and its managers, supervisors, and other employees.

128.    Title VII prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], 42 U.S.C. § 2000e-3(a).

129.    Defendant intentionally and unlawfully retaliated against Plaintiff for opposing the discrimination by terminating his employment.

130.    But for Plaintiff's protected complaints of race and national origin-based discrimination, he would not have been subjected to the unlawful employment practices complained of above.

131.    The effect of the practices complained of in the forgoing paragraphs has been to deprive Plaintiff of the enjoyment of the benefits of employment and has otherwise adversely affected his status as an employee in violation of 42 U.S.C. §2000e-2.

132.    The unlawful practices described above were intentional.

133.    The unlawful employment practices complained of above were done with malice or with reckless indifference to Plaintiff's federally protected rights.

134.    As a direct result of Defendant's actions, Plaintiff has suffered significant injuries, damages, and losses to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully request that this Court enter judgment in their favor and against Defendant, and award him all relief allowed by law, including but not limited to the following:

A.    All appropriate relief at law and equity;

B.    Declaratory relief and other appropriate equitable relief;

C.    Economic losses on all claims as allowed by law;

D.    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

E.    Punitive damages on all claims allowed by law and in an amount to be determined at trial;

F.    Attorneys' fees and the costs on all claims allowed by law;

G.    Pre-and post-judgment interest at the lawful rate;

H.    The return of all stock options that had not yet vested at the time of Plaintiff's unlawful termination.

I.    A tax-offset; and,

Any other appropriate relief at law and equity that this court deems just and proper.

**PLAINTIFF HEREBY DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED: September 28, 2023

RATHOD | MOHAMEDBHAI LLC

*s/ Azra Taslimi*
Azra Taslimi
Siddhartha H. Rathod
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400 (t)
(303) 578-4401 (f)
at@rmlawyers.com
sr@rmlawyers.com

ATTORNEYS FOR PLAINTIFF